UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| MESHBESHER & SPENCE, LTD., | Civil No. 03-3434 (JRT/JSM) |
| Plaintiff, | |
| v. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT** |
| SPRINT SPECTRUM, L.P., a limited partnership, d/b/a Sprint PCS, | |
| Defendant. | |

---

Daniel J. Boivin and Konstandinos Nicklow, **MESHBESHER & SPENCE**, 1616 Park Avenue, Minneapolis, MN 55404, for plaintiff.

Cynthia P. Arends and Teresa J. Kimker, **HALLELAND LEWIS NILAN & JOHNSON**, 220 Sixth Street South, Suite 600, Minneapolis, MN 55402, for defendant.

This case arises out of an alleged oral agreement between the Meshbesher & Spence ("M&S") law firm and Sprint Spectrum, L.P. ("Sprint"), a telecommunications company. According to M&S, Sprint failed to comply with its oral promise to take over M&S's office space and assume all obligations under M&S's sublease. M&S filed suit against Sprint alleging claims of equitable and promissory estoppel. This matter came on for trial from April 11, 2005 through April 13, 2005, and on April 15, 2005. Based on the entire record and proceedings, the testimony at trial and arguments of counsel, the Court enters the following Findings of Fact and Conclusions of Law.

**FINDINGS OF FACT**

1.   All of the Findings of Fact set forth herein are undisputed or have been proven by a preponderance of the evidence.

2.  To the extent that the Court's Conclusions of Law include what may be considered Findings of Fact, they are incorporated herein by reference.

3.  Meshbesher & Spence, Ltd. ("M&S") is a Minnesota law firm.

4.  Ronald I. Meshbesher is M&S's President and a member of M&S's Board of Directors.

5.  Daniel Boivin is a partner with M&S and a member of M&S's Board of Directors.

6.  David Reese is the firm administrator at M&S.

7.  James H. Gilbert was a partner with M&S. He left the firm in January 1998.

8.  Sprint Spectrum, L.P. ("Sprint") is a telecommunications company, with its principal place of business in Overland Park, Kansas.

9.  Ron Sanders was Sprint's Regional President for the North Central Region and head of Sprint's Minneapolis office in 1996 and 1997.

10. Steve Bina was Sprint's Regional Operations Director for the North Central Region and was based in Minneapolis from 1996-1998. Bina reported to Sanders.

11. Russell Simatic, a Sprint area vice president, took over the Minneapolis office in February 1998.

12. M&S maintained an office in approximately one-half of the 15th floor of the 601 Carlson Tower building ("Carlson Tower") in Minnetonka, Minnesota from 1995 through June 30, 1998. M&S sublet the space from Walden Auto Leasing II, Inc.

("Walden") pursuant to a written sublease. M&S's sublease from Walden lasted through February 28, 2001.

13. In March 1997, Sprint subleased approximately one-half of the 15th floor of the Carlson Tower from Walden pursuant to a written lease agreement. Sprint's space was adjacent to M&S's space.

14. The sublease between Walden and Sprint contained the following provision:

> The parties acknowledge that under a separate sublease agreement, Sublandlord is subleasing to Meshbesher & Spence Ltd. ("Meshbesher") that portion of the fifteenth (15th) floor of the Building which is not contained within the Subleased Premises ("Meshbesher Space") as depicted on Exhibit A hereof. Sublandlord agrees that if at any time during the Sublease Term, Meshbesher vacates any portion of the Meshbesher Space or that any portion of the Meshbesher Space becomes available for sublease, that Sublandlord will so notify Subtenant, in writing. Subtenant shall have the right to sublease any such portion of the Meshbesher Space by notifying Sublandlord, in writing, of its intention to do so within ten (10) days after Sublandlord's notice referred to above. Any such portion of the Meshbesher Space shall be sublet by Subtenant under the same terms and conditions as are contained in this Sublease including the same Base Rent per rentable square foot and at the same Operating Cost Rental per rentable square foot as are applicable to the original Subleased Premises hereunder. In such event, the parties agree to execute an amendment to this Sublease adding any such portion of the Meshbesher Space to the Subleased Premises.

(Pl's Ex. 28, ¶ 18(a).)

15. Sprint took possession of the space on the 15th floor of the Carlson Tower on June 30, 1997, and moved into the space in late July or early August 1997.

16. Before occupying the space, Sprint agreed with Walden to take over 1674 square feet of M&S's space on the 15th floor.

17.  On July 22, 1997, Gilbert sent Bina a letter confirming that M&S would vacate the office space so Sprint could occupy it.  No one from Sprint responded to Gilbert's letter.

18.  M&S vacated the 1674 square feet and Sprint moved in.  M&S stopped paying Walden for the space and Sprint started paying Walden for the space.  M&S and Sprint never signed an agreement.  Walden and Sprint never executed an amendment to the sublease.  Sprint took over the space on the same terms and conditions in its sublease with Walden.

19.  In the summer of 1997, Sprint and M&S began discussions about Sprint subleasing the rest of M&S's space on the 15th floor through the end of M&S's sublease in February 2001.

20.  On July 10, 1997, Bina sent a fax to Dave Mutert, Sprint's Director of Finance, in Kansas City stating:

> We are also in the process of negotiating the remainder of the 15th floor.  The current tenant, also a subtenant of Walden Automotive, is considering a move and Walden has asked if we'd be interested.  Obviously the answer is yes as the space is offered to us at the same rate we currently have.  Should this become a reality we [sic] make it an amendment to the current sub-lease increasing the square footage.

(Pl's Ex. 30.)

21.  Gilbert handled the initial discussions with Sprint in regards to Sprint taking over M&S's sublease.  When Gilbert left M&S in January 1998, he believed he had an agreement in principle with Sprint for Sprint to sublease the remainder of M&S's office space from Walden, but any such agreement was never reduced to writing or made definite in any respect.

22. On October 29, 1997, Meshbesher signed a purchase agreement for a building at 9950 Wayzata Boulevard in St. Louis Park, Minnesota, and tendered a $5,000 escrow payment. Meshbesher purchased the property for $800,000.

23. On November 21, 1997, Boivin sent a letter to Sanders and Bina regarding the alleged agreement. The letter purported to "memorialize the understanding" between M&S and Sprint regarding M&S's space on the 15th floor. The letter stated that Sprint agreed "to assume and pay for all of the obligations under our sublease for the space located on the 15th floor, effective no earlier than January 1, 1998 and no later than May 1, 1998, with notice of actual date 30 days prior to date." (Pl's Ex. 8.)

24. No one at Sprint responded to the letter. No one at M&S followed up with anyone at Sprint about the letter.

25. M&S and Sprint never entered into a written agreement with respect to M&S's office space.

26. On December 29, 1997, M&S closed on the purchase of the building in St. Louis Park, Minnesota.

27. On May 27, 1998, Meshbesher sent a letter to Simatic stating that Sprint had an obligation to sublease M&S's space. John Chapman from Sprint's legal department in Kansas City responded to Meshbesher's letter on June 26, 1998. Chapman's letter stated that Sprint had not undertaken any obligation to assume M&S's space.

28. On June 30, 1998, M&S vacated the Carlson Tower and relocated to the building in St. Louis Park.

## CONCLUSIONS OF LAW

1. M&S asserts that Sprint orally agreed to sublease M&S's space until the end of M&S's lease term in February 2001. The Court previously held that the statute of frauds bars enforcement of such an oral agreement because contracts that cannot be performed within one year and contracts that are for a lease of more than one year must be in writing. *Meshbesher & Spence, Ltd. v. Sprint Spectrum L.P.*, 2004 WL 2801590, at *2-3 (D. Minn. Nov. 19, 2004) (applying Minnesota Statute sections 513.01 and 513.05 to the alleged oral agreement between M&S and Sprint). The Court also held, however, that application of the statute of frauds can be limited by the application of equitable or promissory estoppel. *Id.* at *3 (citing *Berg v. Carlstron*, 347 N.W.2d 809, 812 (Minn. 1984)).

2. The Minnesota Supreme Court has found that in order for an equitable estoppel claim to remove an oral agreement from the statute of frauds, the plaintiff must show a misrepresentation or concealment of facts that is "akin to fraud." *Del Hayes & Sons, Inc. v. Mitchell*, 230 N.W.2d 588, 595 (Minn. 1975). The Minnesota Supreme Court has also held that equitable estoppel "arises when one by his acts or representations, or by his silence when he ought to speak, intentionally or through culpable negligence, induces another to believe certain facts to exist." *Transamerica Ins. Group v. Paul*, 267 N.W.2d 180, 183 (Minn. 1978).

3. Promissory estoppel can also remove an oral agreement from the statute of frauds. Although there is some uncertainty in the state courts, this Court held in its previous Order that, if faced with this case today, the Minnesota Supreme Court would

find that a promissory estoppel claim can defeat the statute of frauds "when the detrimental reliance is 'of such a character and magnitude that refusal to enforce the contract would permit one party to perpetuate a fraud.'" *Meshbesher,* 2004 WL 2801590, at *4 (quoting *Del Hayes*, 230 N.W.2d at 594). "A mere refusal to perform an oral agreement, unaccompanied by unconscionable conduct . . . is not such a fraud as will justify disregarding the statute [of frauds]." *Del Hayes*, 230 N.W.2d at 594.

4. M&S asserts that Sprint should be equitably estopped from asserting that an oral contract did not exist. In order to establish a claim for equitable estoppel, M&S must show that 1) Sprint made representations or inducements; 2) M&S reasonably relied upon the representations; and 3) M&S will be harmed if estoppel is not allowed. *Meshbesher*, 2004 WL 2801590, at *3. Furthermore, "[a] contract – oral or otherwise – does not exist unless the parties have agreed with reasonable certainty about the same thing and on the same terms." *Slidell, Inc. v. Millennium Inorganic Chems., Inc.*, 2004 WL 1447921, at *16 (D. Minn. June 28, 2004) (internal quotations omitted).

5. Promissory estoppel, on the other hand, "is the name applied to a contract implied in law where no contract exists in fact." *Del Hayes*, 230 N.W.2d at 593. In order to assert a claim of promissory estoppel, M&S must prove that 1) Sprint made a clear and definite promise; 2) Sprint intended and did induce reliance; and 3) justice requires enforcement of the promise against Sprint. *Meshbesher*, 2004 WL 2801590, at *4.

6. The Court finds that Sprint's conduct was neither "akin to fraud," nor unconscionable for the purposes of removing the alleged agreement from the statute of frauds. Sprint did not intentionally mislead M&S. It is clear on the record that M&S and

Sprint had several discussions about Sprint taking over M&S's lease and that both parties were enthusiastic about the possibility. The Court is not convinced, however, that a final agreement was ever reached or that Sprint did anything to conceal facts from M&S or to hide it true intentions. Sprint's lack of response to Boivin's November 21st letter, for example, may well be irresponsible, but the Court cannot find that it is unconscionable. There is no evidence that Sprint did not respond to the letter in an attempt to induce M&S to take a certain action. Rather, it seems likely that representatives of Sprint continued to disagree about the advisability of taking over the rest of M&S's space, and that disagreement led simply to inaction. Sprint's initial interest in the space is undisputed, but lack of follow through on expressed interest is not enough to remove the alleged oral agreement from the statute of frauds either under equitable estoppel or promissory estoppel.

7. The Court finds that M&S and Sprint did not form an oral contract, nor did Sprint make a clear and definite promise to M&S in regards to taking over M&S's sublease. M&S points to several documents as evidence of the essential terms of the agreement, including the sublease M&S had with Walden which contained the square footage and the end date of the lease, Sprint's sublease with Walden which contained the cost per square foot and conditions of the sublease, and the letter from Boivin which contained an approximate start date. This patchwork of documents, however, does not amount to a mutual agreement between M&S and Sprint on the essential terms of the contract, nor a clear and definite promise by Sprint. Sprint was not a party to the sublease between M&S and Walden, nor did Sprint sign or even respond to the letter

from Boivin.  Furthermore, the Court is unwilling to accept M&S's assertion that an agreement, including all material terms, was struck between the parties when there is no evidence as to when the agreement was actually reached.  The Court is equally unwilling to recognize Boivin's November 21st letter as expressing the material terms of the contract when it contains a hold harmless clause that both parties agree was not part of their discussions.

8.  The Court also finds that M&S did not reasonably rely on Sprint's representations.  "[T]he question to be asked when determining reasonable reliance is not whether the representation would deceive the average [person] . . . (but rather) whether the representations were . . . calculated to deceive . . . a person of the capacity and experience of the particular individual who received the representations."  *Berg v. Xerxes-Southdale Office Bldg Co.*, 290 N.W.2d 612, 616 (Minn. 1980) (internal quotations omitted).  Both parties in this case are sophisticated business entities.  Gilbert, Boivin, and Meshbesher are all attorneys who are familiar with real estate law and the statute of frauds.  As such, it would be unreasonable for M&S to rely on the prior dealings of the parties with respect to the 1674 square feet of space.  In that instance, Sprint took over M&S's office space before it moved into Carlson Tower pursuant to an agreement with Walden.  It would also be unreasonable for M&S to rely on Sprint's silence in response to Boivin's letter.  A reasonable response to such silence would be to follow up on the letter before purchasing an $800,000 building.  Furthermore, M&S signed the purchase agreement for the building before it sent the letter.  The extent to which it relied on Sprint's silence in response to the letter is, therefore, questionable.

Finally, it would be unreasonable for M&S to purchase a building in reliance on an agreement which they cannot say when it was actually reached and which, at the time they signed the purchase agreement, did not include the material term of when the agreement would commence.

The Court surely understands how this dispute arose. The parties had earlier informally agreed to transfer responsibility for the lease on a different part of M&S's office space and Gilbert, M&S's negotiator, left the firm presuming that the same course of action would govern the rest of the space. Others at M&S then relied to some extent on Gilbert's understanding, Sprint's interest in the space became diminished, and attempts at communication failed with the parties disputing whether an agreement had been reached. While unfortunate, the situation does not result in liability for Sprint under the theories that remain in this case.

## ORDER

Based on the Court's Findings of Fact and Conclusions of Law, it is hereby **ORDERED** that judgment be entered in favor of defendant and against plaintiff on each of plaintiff's claims.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:     July 6, 2005                              s/ John R. Tunheim
at Minneapolis, Minnesota.                            JOHN R. TUNHEIM
                                                     United States District Judge